**Adelyn L. LUTHER, Relator,**

v.

**COMMISSIONER OF REVENUE, Respondent.**

No. C0–98–406.

Supreme Court of Minnesota.

Feb. 4, 1999.

David R. Brennan, Faegre & Benson LLP, Minneapolis, for relator.

Michael A. Hatch, Minnesota Attorney General, Ms. Michelle M. Owen, Assistant Attorney General, St. Paul, for respondent.

## OPINION

### PAUL H. ANDERSON, J.

Relator Adelyn L. Luther appeals, by writ of certiorari, from the Minnesota Tax Court's decision affirming the Commissioner of Revenue's determination that Luther was a nondomiciliary resident for Minnesota income tax purposes and that, therefore, Minnesota could properly tax her worldwide income. The commissioner determined that, in 1990, Luther fit within Minnesota's definition of a nondomiciliary resident because she (1) maintained an abode in Minnesota and (2) spent more than one-half of 1990 here. Based on this determination, the commissioner adjusted Luther's assessed income tax, increasing the tax due from $23,309 to $238,101.36 plus interest.

Luther appealed the commissioner's determination to the tax court, asserting that she did not fit within the statutory definition of a nondomiciliary resident because she was not present in Minnesota for more than one-half of 1990. In the alternative, Luther argued that if she did fit within the definition of a nondomiciliary resident, then the nondomiciliary resident statute violates both the Due Process Clause of the Fourteenth Amendment to the United States Constitution and the Commerce Clause of the United States Constitution. The tax court agreed with the commissioner's determination that Luther fit within the definition of a nondomiciliary resident and also concluded that the nondomiciliary resident statute violates neither the Due Process Clause of the Fourteenth Amendment nor the Commerce Clause. We affirm.

The essential facts underlying this case are undisputed. It appears that, prior to 1987, Luther was a Minnesota domiciliary, but that, since 1987, Luther has been a Florida domiciliary. In 1990, Luther owned a single-family dwelling in Minnetonka, Minnesota, as well as dwellings in Florida, Hawai'i, and Montana. In Florida, Luther owned and maintained her primary dwelling, which was homesteaded. In 1989 and 1990, Luther lived in her Florida dwelling from November until the following May. She was registered to vote in Florida, maintained a driver's license and registered a motor vehicle there, and held membership in a Florida social club. She maintained Florida checking and savings accounts. The investment activities for the Morris L. Gordon Family Trust—the income from which is the primary subject of this litigation—were performed principally in Florida.

In 1990 in Minnesota, Luther maintained what she considered to be her summer home, which was not homesteaded. She lived in this dwelling from approximately early May until early November, at which time it was "closed up" for the winter and Luther relocated to her Florida dwelling. Luther also had at least three bank accounts in Minnesota in 1990, including a checking and a savings account with Norwest Bank and a savings account with Marquette Bank. In addition, she maintained an investment account in Minnesota with Merrill Lynch, which managed approximately $205,000 of her investments.

Luther maintained numerous business contacts in Minnesota in 1990. She was a stockholder in and served as chairperson of the board of directors of Cardinal Glass Company, a Minnesota subchapter S corporation that was started over 30 years ago by her late husband. In her capacity as chairperson of the board, she attended director and

shareholder meetings of Cardinal Glass that commenced on the following dates and were held at the following locations: March 31—Minneapolis; July 10—Minneapolis; December 6—Kansas City; and December 7—Minneapolis. During the July board meeting, Luther was living in her Minnetonka dwelling. During the March and December board meetings, Luther traveled to Minnesota from Florida and stayed in a hotel because her Minnetonka home had been closed up for the winter. When Luther traveled to Minnesota from Florida to attend both the March and December board meetings, she arrived on Friday, attended the board meeting on Saturday, attended a board of directors luncheon on Sunday, missed or otherwise changed her flight on Monday, and returned to Florida on Tuesday. Cardinal paid all Luther's expenses associated with attending these meetings, including air fare and hotel.

During 1990, Luther also owned 85.73% of the voting stock and served as president of Richatti Investment Company, a Minnesota corporation started in 1967, originally under the name of Almore Company. Richatti, named after Luther's children, is a holding company that owns real estate in Minnesota. In addition to her involvement with Cardinal Glass and Richatti, Luther owned rental property in Minnesota in 1990.

During 1990, Luther spent 171 full days in Minnesota and spent 176 full days outside of Minnesota. The remaining 18 days of that year were days when Luther spent part of the day in Minnesota, but traveled between Minnesota and another location. How these 18 days are treated is critical to Luther's claim that she is not a Minnesota nondomiciliary resident. These 18 days will be referred to in this opinion as "travel days."

Luther's 1990 federal individual income tax return indicates that her 1990 adjusted gross income was $3,271,761 and that her 1990 federal income tax payable was $858,301. For 1990, she realized gross interest income of $2,863,029, of which $181,299 was reported on her federal income tax return as being tax-exempt interest. Of the tax-exempt interest, $178,839 was derived from non-Minne-sota obligations. Luther reported the net amount of $2,681,730 as 1990 taxable interest income.

Luther filed a 1990 Minnesota nonresident income tax return, on which she reported income from sources within Minnesota in the amount of $308,636 and income tax payable to Minnesota of $23,309. However, the parties agree that the correct amount of income from sources within Minnesota in 1990 should have been $340,767. Luther filed a Florida individual intangible tax return for taxable assets as of January 1, 1990 in which she listed total taxable assets of $2,829,133 and tax due of $2,829.

The commissioner examined Luther's 1990 income tax returns and supporting documentation. At the conclusion of this examination, Luther and the commissioner could not agree on whether Luther fit within the definition of a nondomiciliary resident in 1990.[1] The nondomiciliary resident statute provides that a person will be considered a Minnesota resident when that person: (1) maintains an abode in Minnesota, and (2) spends in the aggregate more than one-half of the tax year here. *See* Minn.Stat. § 290.01, subd. 7(2) (1990). The commissioner determined that Luther was a nondomiciliary resident of Minnesota in 1990 because: (1) she maintained an abode—a single-family dwelling—in Minnesota, and (2) she spent 189 complete or partial days in Minnesota. Based on this determination, the commissioner recalculated Luther's Minnesota income tax assessment, then issued a Notice of Change in Income Tax assessing the amount owed by Luther to be $322,374.58—$238,101.36 in tax plus $84,273.22 in interest.

Luther appealed the commissioner's determination to the tax court. On appeal, Luther contended that she had not spent more than one-half of the year in Minnesota in 1990 and that, consequently, she did not fit within the definition of a nondomiciliary resident and Minnesota could not tax her worldwide income. She also raised the following constitutional issues: whether the Minnesota nondomiciliary resident statute violated the Due

---

1. Minnesota Statute section 290.01, subdivision 7(2) has been amended since 1990. However, the definition of a nondomiciliary resident has not changed or been amended.

Process Clause of the Fourteenth Amendment to the U.S. Constitution, the Commerce Clause of the U.S. Constitution, and the Due Process Clause of the Minnesota Constitution. The tax court referred determination of these constitutional issues to the district court. The district court subsequently transferred determination of these issues back to the tax court.

At trial, Luther argued that the Minnesota nondomiciliary resident statute requires the commissioner to compare the number of days Luther spent in Minnesota with the number of days she spent outside Minnesota in order to determine whether she spent more than one-half of 1990 in Minnesota. She argued that the 18 travel days the commissioner allocated as days spent in Minnesota should have either been allocated as both days spent in Minnesota and days spent outside of Minnesota or apportioned between Minnesota and Luther's non-Minnesota location. She also argued that some of the days she spent in Minnesota in 1990 should not have been counted as days spent in Minnesota because those days fell under Minnesota's transit rule—a rule providing that "a person in transit between two points outside Minnesota who is physically present in Minnesota less than 24 hours, will not be treated as present in Minnesota on any day during transit." Minn. R. 8001.0300, subp. 4 (1989). Luther claimed, alternatively, that application of the nondomiciliary resident statute violated the Due Process Clause of the Fourteenth Amendment because her intangible income was not within Minnesota's tax jurisdiction and, thus, application of the statute represented an unconstitutional extraterritorial tax. Finally, she argued that application of the statute violated the Commerce Clause in that such application constituted a discriminatory tax on interstate travel and was not fairly apportioned or related to the benefits Luther received in Minnesota.

The tax court affirmed the commissioner's order assessing additional personal income tax liability against Luther. The court concluded that Luther was a Minnesota resident as defined in the nondomiciliary resident statute, that the language of the statute means that when a person spends more than one-half of the days of a year in Minnesota, then that person fits within the meaning of the statute, and that the transit exception was inapplicable to Luther's case. The court also concluded that Luther's contacts with Minnesota in 1990 sufficiently demonstrated that she "availed herself of the protection of the laws of the state" and that, therefore, application of the nondomiciliary resident statute did not violate the Due Process Clause of the Fourteenth Amendment. Finally, the tax court concluded that, while the Commerce Clause was implicated in Luther's case in that "movement between states constitutes interstate travel," application of the nondomiciliary resident statute does not violate the Commerce Clause.

Luther appeals to this court on writ of certiorari, again arguing that she does not fit within Minnesota's definition of a nondomiciliary resident and that, alternatively, if she does fit within the definition, then Minnesota's nondomiciliary resident statute is unconstitutional under the Due Process Clause of the Fourteenth Amendment and the Commerce Clause.

I.

Luther first asserts that she does not fit within the statutory definition of a Minnesota nondomiciliary resident because she was not present in Minnesota in 1990 for "more than one-half of the year." Minn.Stat. § 290.01, subd. 7(2). Construction of statutory provisions are matters of law which we review de novo. *See In re Conservatorship of Foster*, 547 N.W.2d 81, 84–85 (Minn.1996). When the language of a statute is clear, courts must apply that plain language. Minn.Stat. § 645.16 (1998).

Minnesota individual income tax statutes provide two definitions of a Minnesota resident. Minn.Stat. § 290.01, subd. 7 (1990). First, a person may be considered a Minnesota resident if that person is domiciled in Minnesota. Minn.Stat. § 290.01, subd. 7(1) (1990). Second, a nondomiciliary may be considered a Minnesota resident if that person (1) maintains a place of abode in Minnesota and (2) spends in the aggregate more than one-half of the tax year in Minnesota. Minn.Stat. § 290.01, subd. 7(2). This second

definition of a Minnesota resident—the non-domiciliary resident statute—is at issue in this case. If a taxpayer is a Minnesota "resident," Minnesota taxes her worldwide net income. *See* Minn.Stat. §§ 290.01, subd. 7, 290.014, subd. 1 (1990). The state taxes the income of nonresidents only to the extent that income is derived from activities within Minnesota. Minn.Stat. § 290.014, subd. 2 (1990).

Luther does not dispute that she fits within the first prong of the nondomiciliary resident statute—she maintains a place of abode in Minnesota in the form of the single-family dwelling she owns and occupies in Minnetonka. Rather, Luther asserts that she did not spend more than one-half of 1990 in Minnesota and that, therefore, she does not fit within the second prong of the statute. In asserting that she did not spend more than one-half of 1990 in Minnesota, Luther does not challenge the fact that she was present in Minnesota for 189 days that year. She acknowledges that she spent 171 full days in Minnesota in 1990. She also acknowledges that in 1990 she spent part of each of the 18 travel days in Minnesota. Instead, she takes issue with the commissioner's application of the nondomiciliary resident statute to the travel days and to days she spent in Minnesota while attending board of directors' meetings for Cardinal Glass in March and December.

Luther asserts that the nondomiciliary resident statute requires the commissioner to either allocate each of the 18 travel days as both a day spent in Minnesota and a day spent outside of Minnesota or apportion those 18 days between Minnesota and her other destination. She further asserts that after this allocation or apportionment is made, the commissioner must then compare the number of days she spent in Minnesota with the number of days she spent outside of Minnesota to determine whether she spent more than one-half of the year in Minnesota. Under Luther's first method of calculation, she spent 189 days in Minnesota and 194 days outside of Minnesota. Under her second method of calculation, she spent 180 days in Minnesota and 185 days outside of Minnesota. Luther concludes that because, under

each of her methods of calculation, she spent more time outside of Minnesota than she spent in Minnesota in 1990, she did not spend more than one-half of the year in Minnesota and, therefore, she does not fit within the definition of a nondomiciliary resident.

■ Luther's methods of calculation are contrary to the plain language of the nondomiciliary resident statute. The nondomiciliary resident statute speaks only to ascertaining days spent in Minnesota. Specifically, the statute provides that "presence within the state for any part of a calendar day constitutes a day spent in the state." Minn. Stat. § 290.01, subd. 7(2). The statute contains no corresponding provision that provides for ascertaining days spent outside of Minnesota or for the apportionment of days between Minnesota and the other location to or from which Luther traveled. Moreover, the plain language of the nondomiciliary resident statute does not suggest, much less require, any comparison of days spent in Minnesota and outside of Minnesota during a given tax year. As the nondomiciliary resident statute speaks only to ascertaining days spent in Minnesota, we conclude that neither of Luther's proposed methods of calculation comports with the plain language of the non-domiciliary resident statute. Thus, we decline to adopt either of Luther's proposed methods of allocating the travel days.

■ Luther next asserts that the two five-day periods of time she spent in Minnesota while attending board of directors' meetings in March and December of 1990 should be excluded from the commissioner's calculation of days spent in Minnesota. Each of these five-day periods of time began and ended with a travel day and included three full days in Minnesota between the travel days. In support of her position, Luther argues that we should read Minnesota's transit rule expansively. The transit rule is an exception to the general rule that presence within the state for any part of a calendar day constitutes a day spent within the state.

Rules properly promulgated by the commissioner "have the force of law." *See* Minn. Stat. § 270.06(13) (1990). Consequently, the transit rule, a rule properly promulgated by the commissioner and, accordingly, having

the force of law, is subject to the same rules of construction as a statute. *See* Minn.Stat. § 645.16. Therefore, if the plain language of the transit rule is clear, we must apply that plain language. *See id.*

■ The transit rule provides that "a person in transit *between two points outside Minnesota who is physically present in Minnesota less than 24 hours,* will not be treated as present in Minnesota on any day during transit." Minn. Rules 8001.0300, subp. 4 (emphasis added). Luther argues that Florida was both her origination point and her destination point during her two five-day business trips to Minnesota and that, therefore, the transit rule should be read expansively to include as days spent outside of Minnesota all ten of the days she spent in Minnesota while on these business trips. The transit rule, however, plainly applies only to persons who are (1) traveling through Minnesota while in transit between two other, non-Minnesota locations, and (2) physically present in Minnesota less than 24 hours. *See id.* While Luther was in Minnesota for business purposes, she was not traveling through Minnesota on her way from one non-Minnesota location to another— Minnesota was her destination. Moreover, Luther was present in Minnesota for much longer than 24 hours on each of her business trips. The plain language of the transit rule, which is clear and which this court must apply, does not comport with the reading Luther urges. *See* Minn. R. 8001.0300, subp. 4; Minn.Stat. § 645.16. Accordingly, we conclude that Luther's assertion that the ten days she spent in Minnesota on her two business trips should not be counted as days present in Minnesota lacks merit.

In summary, we decline to adopt either of Luther's proposed methods for allocating the 18 travel days and we conclude that the ten "business" days Luther spent in Minnesota should be counted as days she was present in Minnesota. Therefore, we hold that Luther was present in Minnesota for more than one-half of 1990 and that she fits within Minnesota's definition of a nondomiciliary resident.

## II.

■ Luther next argues that Minnesota's nondomiciliary resident statute is unconstitutional under the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution. The Due Process Clause provides that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV. Due process deals with the fairness of the tax at issue and ensures that the taxpayer has adequate notice that she may be subject to the tax. *See Quill Corp. v. North Dakota,* 504 U.S. 298, 307, 112 S.Ct. 1904, 119 L.Ed.2d 91 (1992). To satisfy due process, there must be (1) "some definite link, some minimum connection, between a state and the person, property or transaction it seeks to tax" and (2) a rational relationship between "the income attributed to the State for tax purposes [and the] values connected with the taxing State." *Id.* at 306, 112 S.Ct. 1904 (citation and internal quotation omitted).

■ The federal system provides the states wide latitude in determining their taxation schemes. *See State Tax Comm'n v. Aldrich,* 316 U.S. 174, 178–79, 62 S.Ct. 1008, 86 L.Ed. 1358 (1942). We exercise our power to declare a statute unconstitutional with extreme caution and only when absolutely necessary. *Miller Brewing Co. v. State,* 284 N.W.2d 353, 356 (Minn.1979). In challenging the nondomiciliary resident statute on constitutional grounds, Luther bears the heavy burden of showing that the statute is unconstitutional beyond a reasonable doubt. *See Caterpillar, Inc. v. Commissioner of Revenue,* 568 N.W.2d 695, 697–98 (Minn.1997).

To satisfy the first requirement of the due process analysis, there must be a "minimum connection between the state and the person, property, or transaction it seeks to tax." *Quill,* 504 U.S. at 306, 112 S.Ct. 1904. This minimum connection has been likened to the minimum contacts necessary to establish personal jurisdiction. *See id.* at 307, 112 S.Ct. 1904 (referencing *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945)). Thus, the relevant inquiry is whether Luther had minimum contacts with Minnesota such that imposition of the tax "does not offend traditional notions of

fair play and substantial justice." *See id.* (citation and internal quotation omitted). To be subject to taxation under Minnesota's nondomiciliary resident statute, a taxpayer must spend a substantial amount of time, more than one-half of the days in a given tax year, in Minnesota. *See* Minn.Stat. § 290.01, subd. 7(2). Further, she must also maintain an abode in Minnesota. *See id.* Luther maintained an abode in Minnesota and, in the aggregate, spent a majority of the days of 1990 here. She has not presented a compelling argument that this connection between Minnesota and her person, as required by the nondomiciliary resident statute, is less than the minimum connection required to satisfy the Due Process Clause. Thus, we conclude that application of the nondomiciliary resident statute does not violate the first requirement of the due process analysis.

To satisfy the second requirement of the due process analysis, a tax must reflect a rational relationship between the income attributed to the state for tax purposes and the "'values connected with the taxing state.'" *Moorman Mfg. Co. v. Bair,* 437 U.S. 267, 273, 98 S.Ct. 2340, 57 L.Ed.2d 197 (1978) (citing *Norfolk & Western R. Co. v. State Tax Comm'n,* 390 U.S. 317, 325, 88 S.Ct. 995, 19 L.Ed.2d 1201 (1968)).

> "The income tax is founded upon the protection afforded to the recipient of the income by the government, in his right to receive the income and in his enjoyment of the income when in his possession. That government provides for him all the advantages of living in safety and in freedom and of being protected by law. It gives security to life, liberty and the other privileges of dwelling in a civilized community. It exacts in return a contribution to the support of that government measured by and based upon the income, in the fruition of which it defends him from unjust interference."

*Maguire v. Trefry,* 253 U.S. 12, 14, 40 S.Ct. 417, 64 L.Ed. 739 (1920) (quoting *Maguire v. Comm'r,* 230 Mass. 503, 120 N.E. 162, 166 (1918)).

In 1990, Luther had the opportunity to enjoy the many services, benefits, and protections afforded her by Minnesota in her right to receive and enjoy her income. She used Minnesota roads and enjoyed police and fire protection. Her home was protected by these services all year long. On every day of the year, state laws protected her checking, savings, and investment accounts, as well as the corporations with which she was affiliated. When Luther was in the state, she also benefited from Minnesota's high health and environmental standards, educational opportunities, arts and cultural opportunities, and state recreational resources, all of which are supported by state government. While the above list of services, benefits, and protections is not exhaustive, this listing makes it clear that, for the majority of 1990, Luther enjoyed the many services, benefits, and protections Minnesota provided for her. Therefore, Minnesota required her to contribute to the costs associated with providing those services, benefits, and protections by taxing her income as a nondomiciliary resident. Luther cannot carry her burden of proving beyond a reasonable doubt that Minnesota's requirement that she contribute to the costs associated with providing the many services, benefits, and protections she received is not rationally related to her receipt and enjoyment of those services, benefits, and protections. Thus, we conclude that the nondomiciliary resident statute does not violate the second requirement of the due process analysis.

Luther attempts to analogize her case to business taxation cases which apply the unitary business rule of apportionment. Under the unitary business rule of apportionment, a state may tax the income of a multistate business only in proportion to the percentage of the larger, unitary business that is represented by the in-state component of that business. *See Allied–Signal, Inc. v. Director, Div. of Tax'n,* 504 U.S. 768, 778, 112 S.Ct. 2251, 119 L.Ed.2d 533 (1992). The concern underlying the unitary business rule of apportionment is the risk of multiple taxation. *See id.* However, individual taxpayers and corporate taxpayers may constitutionally be treated differently for tax purposes. *See. Lawrence v. State Tax Comm'n,* 286 U.S. 276, 283, 52 S.Ct. 556, 76 L.Ed. 1102 (1932). Indeed, states may impose "double taxation,

or any other form of unequal taxation [on an individual taxpayer], so long as the inequality is not based upon arbitrary distinctions." *See Shaffer v. Carter,* 252 U.S. 37, 58, 40 S.Ct. 221, 64 L.Ed. 445 (1920). Moreover, even if the risk of multiple taxation of individual taxpayers was a due process concern, no such taxation would result here because Minnesota provides a credit for income tax paid to a nondomiciliary resident's state of domicile. *See* Minn.Stat. § 290.06, subd. 22(a) (1990).

Luther also argues that Minnesota cannot tax her intangible income because only Florida, her state of domicile, may tax this intangible income. Two of the three cases Luther cites in support of her argument do not support her position. *See Curry v. McCanless,* 307 U.S. 357, 368, 59 S.Ct. 900, 83 L.Ed. 1339 (1939) (stating "there are many circumstances in which more than one state may have jurisdiction to impose a tax and measure it by some or all of the taxpayer's intangibles"); *Hillstrom v. Commissioner of Revenue,* 270 N.W.2d 265 (Minn.1978) (holding that a state of domicile may tax intangible income in the form of gambling winnings from out of state gambling, but not discussing whether a state other than the state of domicile may tax such intangible income). The third case Luther cites in support of her position has been implicitly overruled. *See Newport Co. v. Wisconsin Tax Comm'n,* 219 Wis. 293, 261 N.W. 884 (Wis.1935) (holding that only the state of domicile may tax income from intangibles), *implicitly overruled by State Tax Comm'n v. Aldrich,* 316 U.S. 174, 181–82, 62 S.Ct. 1008, 86 L.Ed. 1358 (1942) (stating "[a]nother state which has extended benefits or protection, or which can demonstrate 'the practical fact of its power' or sovereignty as respects the [intangibles], may likewise constitutionally make its exaction.") (internal citation omitted).

We conclude that Minnesota's nondomiciliary resident statute is based on a minimum connection between Minnesota and Luther and that imposition of the tax represents a rational relationship between Luther's income and the benefits she received from Minnesota. Accordingly, we hold that Minnesota's nondomiciliary resident statute

is constitutional under the Due Process Clause of the U.S. Constitution.

## III.

■ Finally, Luther argues that application of Minnesota's nondomiciliary resident statute violates the Commerce Clause of the U.S. Constitution. A tax may be consistent with due process but still violate the Commerce Clause. *Quill,* 504 U.S. at 313 n. 7, 112 S.Ct. 1904. While the Due Process Clause is concerned with fairness in the form of notice to a taxpayer that she may be subject to a state tax, the Commerce Clause focuses on "structural concerns about the effects of state regulation on the national economy." *Id.* at 312, 112 S.Ct. 1904. As with her arguments under the Due Process Clause, Luther bears the burden of proving beyond a reasonable doubt that the nondomiciliary resident statute is unconstitutional under the Commerce Clause. *See Caterpillar,* 568 N.W.2d at 697–98.

The Commerce Clause states that "[t]he Congress shall have Power * * * To regulate Commerce with foreign Nations, and among the several States." U.S. Const. art. I, § 8, cl. 3. While the Commerce Clause represents an affirmative grant of power to Congress, it has long been held to impliedly contain a negative command to the states that states cannot, through the enactment of statutes or regulations, discriminate against or unduly burden interstate commerce. *Quill,* 504 U.S. at 312, 112 S.Ct. 1904. This implied negative command is known as the "dormant" Commerce Clause. *Id.; see also Oklahoma Tax Comm'n v. Jefferson Lines, Inc.,* 514 U.S. 175, 178, 115 S.Ct. 1331, 131 L.Ed.2d 261 (1995). In determining whether application of Minnesota's nondomiciliary resident statute discriminates against or unduly burdens interstate commerce, we first determine whether application of the nondomiciliary resident statute implicates the Commerce Clause at all. *See United States v. Lopez,* 514 U.S. 549, 559, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995); *Tamagni v. Tax Appeals Tribunal,* 91 N.Y.2d 530, 673 N.Y.S.2d 44, 695 N.E.2d 1125, 1131 (N.Y.1998). If application of the statute does implicate the Commerce Clause, then we must determine

whether the Commerce Clause is violated by such application. *See Tamagni,* 673 N.Y.S.2d 44, 695 N.E.2d at 1133.

### A. *Implication of the Commerce Clause*

 For the Commerce Clause to be implicated, application of Minnesota's statute must substantially affect interstate commerce, i.e., interstate economic activity. *Lopez,* 514 U.S. at 559, 567, 115 S.Ct. 1624; *Tamagni,* 673 N.Y.S.2d 44, 695 N.E.2d at 1130. Commerce is defined as "the commercial intercourse between nations, and parts of nations, in all its branches." *Lopez,* 514 U.S. at 553, 115 S.Ct. 1624 (citation and internal quotation omitted). The purpose of the dormant Commerce Clause is not "to protect state residents from their own state taxes." *Goldberg v. Sweet,* 488 U.S. 252, 266, 109 S.Ct. 582, 102 L.Ed.2d 607 (1989). Instead, "[t]he dormant Commerce Clause protects markets and participants in markets." *General Motors Corp. v. Tracy,* 519 U.S. 278, 300, 117 S.Ct. 811, 136 L.Ed.2d 761 (1997). Thus, Luther must initially show that application of Minnesota's statute has a substantial effect on an identifiable interstate economic activity or market.

Luther argues that application of Minnesota's nondomiciliary resident statute amounts to a tax on interstate commerce and, specifically, her right under the Commerce Clause to interstate travel. In support of her argument that her right to interstate travel is violated, Luther cites *United States v. Guest,* 383 U.S. 745, 86 S.Ct. 1170, 16 L.Ed.2d 239 (1966), and *Edwards v. California,* 314 U.S. 160, 62 S.Ct. 164, 86 L.Ed. 119 (1941). Her reliance on these two cases, however, is misplaced.

In *Guest,* the Supreme Court was asked to determine whether the right to interstate travel was encompassed in a federal conspiracy statute. *See Guest,* 383 U.S. at 747, 757, 86 S.Ct. 1170. The court did not address directly whether the alleged conspiracy to deprive African–Americans of their fundamental right to travel violated the Commerce Clause. Thus, *Guest* is inapplicable to our present Commerce Clause-based analysis. The second case on which Luther relies, *Edwards,* was a Commerce Clause case

involving interstate travel. In *Edwards,* the United States Supreme Court struck down a California statute that made it a crime to transport indigents into the state. *Edwards,* 314 U.S. at 177, 62 S.Ct. 164. The proposition for which *Edwards* stands, however, is not analogous to Luther's case. In *Edwards,* the *transportation* of indigents across state lines implicated the protection of the Commerce Clause. *See id.* at 174, 62 S.Ct. 164. Here, it is not Luther's movement across state lines that is being taxed. Instead, Luther was required to pay Minnesota income tax on her net worldwide income because, through her substantial contacts with Minnesota, she availed herself of the many services, benefits, and protections provided to her by Minnesota. The requirement that she pay Minnesota income tax was triggered by conduct that took place wholly within Minnesota and that did not substantially affect interstate commerce. Therefore, we conclude that her reliance on *Edwards* to support her claim that her right to interstate travel has been violated is misplaced.

 Luther also argues that the constitutional protections of the Commerce Clause are implicated because application of Minnesota's nondomiciliary resident statute taxes income she received from the Florida-based Morris L. Gordon Family Trust. In this argument, Luther appears to contend that the interstate activity taxed by application of the statute is her derivation of income from investment activities that were performed in Florida. Luther's argument fails because it flies in the face of a well-established doctrine concerning taxation of intangible income and does not recognize the basis for Minnesota's tax. The well-established doctrine of *mobilia sequuntur personam* ("movables follow the [law of the] person") has long been cited as standing for the proposition that intangible assets, such as Luther's trust income, have no identifiable situs for tax purposes. *See Delaware v. New York,* 507 U.S. 490, 503, 113 S.Ct. 1550, 123 L.Ed.2d 211 (1993); *Curry,* 307 U.S. at 363 n. 1, 366, 59 S.Ct. 900. Thus, the ownership of intangible assets and income derived from that ownership follow the beneficial owner wherever she goes and may, in proper situations, be taxed in multi-

ple jurisdictions. *Id.* Minnesota taxed Luther's income, the bulk of which was intangible income, on the basis that she availed herself, through substantial contacts with the state, of the services, benefits, and protections Minnesota provided to her. These substantial contacts with Minnesota—maintenance of an abode in Minnesota and presence in Minnesota for more than one-half of the tax year—represent activity that takes place wholly within Minnesota and does not substantially affect interstate commerce. The contacts provide an adequate basis for Minnesota to tax Luther's worldwide net income. Thus, we conclude that application of the nondomiciliary resident statute does not substantially affect interstate commerce. Accordingly, we hold that the Commerce Clause is not implicated in this case.

Because we hold that the Commerce Clause is not implicated through application of the nondomiciliary resident statute, we need not decide whether the nondomiciliary resident statute is constitutional under the Commerce Clause.

Affirmed.

GILBERT, J., took no part.